THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DOWNTOWN ACTION TO SAVE HOUSING,<br><br>               Plaintiff,<br><br>      v.<br><br>MIDLAND CORPORATE TAX CREDIT XIV, LP, *et al.*,<br><br>               Defendants. | CASE NO. C18-0138-JCC<br><br>ORDER |

This matter comes before the Court on Plaintiff Downtown Action to Save Housing ("DASH") motion for partial summary judgment (Dkt. No. 24) and Defendants' cross-motion for summary judgment (Dkt. No. 22). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS Plaintiff's motion for partial summary judgment (Dkt. No. 24) and DENIES Defendants' cross-motion for summary judgment (Dkt. No. 22) for the reasons explained herein.

I.  **BACKGROUND**[1]

DASH is a non-profit, affordable housing developer that creates and preserves living

---

[1] The Court previously ordered Defendants to disclose the citizenship of their individual members. (*See* Dkt. Nos. 41, 43) Having reviewed Defendants' disclosures (Dkt. Nos. 42, 45), as well as the complaint and answer (Dkt. Nos. 1, 18), the Court is satisfied that the parties are completely diverse, and that it has subject matter jurisdiction over DASH's claims.

communities for people with modest incomes. (Dkt. No. 26 at 2.) To achieve its mission, DASH utilizes a federal program that offers tax credits to entities that develop and operate low-income housing properties. (*Id*.) To obtain the tax credits, DASH forms limited partnerships with investors who fund qualifying low-income housing projects. (*Id*.) In return, DASH provides the investors with the tax credits, which are used to reduce the investors' corporate tax liability on a dollar-for-dollar basis. (*Id.* at 2–5.) Tax credits are available for the first 15 years after a qualifying development is placed into service (the "compliance period"). (Dkt. No. 1 at 6); *see also* 26 U.S.C. § 42.

As relevant to this case, DASH formed three limited partnerships (collectively, the "Partnerships") to develop and operate three affordable housing communities (collectively, the "Developments") in King County, Washington. (Dkt. No. 26 at 2–3.) DASH, as general partner, partnered with Defendant Midland Corporate Tax Credit XIV, LP as a limited partner to form Kenmore Senior Associates, LP, and Mountain View Family Associates, LP. (Dkt. No. 18 at 4–6.) Those Partnerships developed and operated Heron Landing Senior Apartments ("Heron Landing") and Mountain View Apartments ("Mountain View"), respectively. (*Id*.) In addition, DASH, as general partner, partnered with Defendant Midland Corporate Tax Credit XVI, LP as a limited partner to form Kenmore Family Associates, LP. (*Id*.) That Partnership developed and operated Heron Run Apartments ("Heron Run"). (*Id*.) Defendant BFIM Special Limited Partner, Inc., is a special limited partner in each of the three Partnerships.[2] (*Id*. at 13, 15.)

The Partnerships are governed by three separate, but essentially identical, partnership agreements. (*See* Dkt. No. 26 at 11–147.) The partnership agreements contain a detailed buyout option (hereinafter "buyout option" or "Section 8.20") that allowed DASH to purchase the Investment Partnerships' entire interest in the Partnerships at the conclusion of each

---

[2] For clarity, the Court will refer to Defendants collectively as the "Investment Partnerships." This is the same naming convention used by the parties in their briefs.

Development's compliance period.[3] (*Id*. at 37.) DASH could exercise the buyout option at its discretion for up to one year after the end of the compliance period for the respective Developments. (*Id*.) The compliance period for all three Developments ended on December 31, 2016, and DASH accordingly had until December 31, 2017 to exercise its buyout options. (*See* Dkt. Nos. 22 at 5, 22-2 at 3, 24 at 10, 26-1 at 48.)

The partnership agreements specify that the buyout price of the Investment Partnerships' interests in the partnerships—*i.e.*, the price that DASH must pay to obtain the interests—shall be "the greater of (i) all federal, state and local taxes imposed on the Investment Partnership[s] attributable to the buyout; or (ii) the fair market value ["FMV"] (as of the date of the closing of the buyout) of the Investment Partnership[s'] interests as determined in accordance with this Section 8.20." (Dkt. No. 26 at 37.)

DASH was required to send the Investment Partnerships written notice of its intent to exercise the buyout option "at least sixty (60) days, but no more than one hundred twenty (120) days prior to the proposed closing date as proposed by [DASH]." (*Id*. at 38.) The buyout notice was required to include a proposed closing date and the following information:

> (1) an appraisal of the assets of the Partnership[s] by an appraiser selected in accordance with this Section 8.20;
>
> (2) an appraisal of the fair market value of the [Investment Partnerships'] interest in the Partnership by an appraiser selected in accordance with Section 8.20;
>
> (3) a calculation by [DASH] of the principal amount and accrued interest of all outstanding indebtedness secured by the Property;
>
> (4) in consultation with the Investment Partnership[s], a calculation by [DASH] of the federal, state and local taxes to be borne by the Investment Partnership[s] attributable to the Investment Partnership[s'] Interest; and
>
> (5) a calculation by [DASH] in accordance with the requirements of Section 8.20

---

[3] The buyout provisions in each of the three partnership agreements are essentially identical. (*See* Dkt. No. 26 at 37–39, 83–85, 131–133.) Because the parties agree that the buyout provisions in each partnership agreement are functionally equivalent for purposes of summary judgment, the Court only cites to the relevant buyout provisions contained in the Kenmore Senior Associates Limited Partnership Agreement. (*See* Dkt. No. 26 at 37–39.)

of the proposed Buyout Price.

(*Id.*) The above values were to be calculated "as of the closing date proposed by [DASH] in its Buyout Notice." (*Id.*) Prior to submitting a buyout notice, DASH was required to propose two appraisers to the Investment Partnerships who possessed certain certifications as specified in Section 8.20(e). (*Id.* at 39.) The Investment Partnerships were required to approve one or both of DASH's proposed appraisers before an appraisal could be conducted. (*Id.*)

The agreed-upon appraiser was required to consider various factors in making its appraisals. (*Id.*) For example, in calculating the value of the Partnerships' assets, the appraiser was specifically directed "to assume that limitations on tenant income, permitted rents and occupancy, as set forth in the Project Documents, shall remain in effect throughout the Extended Use Period." (*Id.*) In calculating the FMV of the Investment Partnerships' interests, the appraiser was required to consider the value of the Partnerships' assets, and "give due consideration to all other relevant factors relating to the value of the [interest] including without limitation" five specific criteria.[4] (*Id.*)

The buyout option also included a provision that allowed the Investment Partnerships to render DASH's buyout notice ineffective. That provision states:

> Any Buyout Notice which fails to include the items required in this Section 8.20 shall not constitute an effective Buyout Notice. If a Buyout Notice includes appraisals or calculations which, in the reasonable opinion of the Investment Partnership, contain material errors, the notice shall not constitute an effective Buyout Notice. Absent an effective Buyout Notice, the Option may not be exercised. In the event Investment Partnership concludes that a notice fails to constitute an effective Buyout Notice, the Investment Partnership shall promptly so notify the General Partner and the General Partner may submit new or amended Buyout Notices at any time during the Option Period.

(Dkt. No. 26 at 38.)

In late 2016, DASH began negotiations with the Investment Partnerships in an attempt to

---

[4] The appraisal criteria included, for example, "limitations on Investment Partnership[s'] management control and management selection," and "limitations on Investment Partnership[s'] ability to require liquidation." (*Id.*)

purchase their Partnership interests. (Dkt. No. 25 at 31.) The parties negotiated throughout 2017, but were unable to agree on a purchase price. (*See* Dkt. No. 26-1 at 65–73.) On October 10, 2017, DASH wrote to the Investment Partnerships proposing two appraisers pursuant to Section 8.20(e) of the buyout option for each Development. (*Id*. at 80–87.) The Investment Partnerships approved one of the proposed appraisers, Wilcox LaMotte Valuation & Advisory ("Wilcox LaMotte"). (Dkt. No. 22-2 at 5.) On December 13, 2017, Wilcox LaMotte provided DASH with appraisals for each of the Developments. (*See* Dkt. Nos. 26-1 at 91–109; 26-2 at 5–22, 30–47.) Wilcox LaMotte appraised the FMV of the Investment Partnerships' interest in the Developments as follows: (1) Heron Run, $9,000; (2) Heron Landing, $0; and (3) Mountain View Apartments, $0. (*Id*.)

On December 15, 2017, DASH submitted buyout notices to the Investment Partnerships for the three Developments. (*See* Dkt. Nos. 26-1 at 89–109; 26-2 at 2–22, 27–47.) In accordance with Section 8.20, DASH proposed a closing date of March 9, 2018. (Dkt. Nos. 26-1 at 90; 26-2 at 3, 28.) In addition to including the Wilcox LaMotte appraisals, DASH calculated the federal, state, and local taxes to be borne by the Investment Partnerships attributable to a sale of their interests as follows: (1) Heron Run, $0; (2) Heron Landing, $59,806.00; (3) Mountain View Apartments, $0. (Dkt. Nos. 26-1 at 111; 26-2 at 24, 49.) Based on the appraised FMV and calculated tax burden, DASH proposed the following buyout prices for each Development: (1) Heron Run, $9,000; (2) Heron Landing, $59,806.00; and (3) Mountain View Apartments, $0. (Dkt. Nos. 26-1 at 112; 26-2 at 25, 50.) Regarding its calculation of the taxes to be borne by the Investment Partnerships, DASH asked the Investment Partnerships to respond within three days of receiving the buyout notices. (Dkt. Nos. 26-1 at 111; 26-2 at 24, 49.)

On December 18, 2017, the Investment Partnerships responded to DASH's buyout notices.[5] (Dkt. No. 26-2 at 54, 57, 60.) The Investment Partnerships stated that the buyout option

---

[5] The Investment Partnerships sent a uniform email response to each of DASH's buyout notices. (*See* Dkt. No. 26-2 at 54, 57, 60.)

did not require them to provide consultation on the tax burden calculation within three days as DASH proposed, and that they would "respond within the first three weeks of January after we have time to review the materials in depth." (*Id*.) The Investment Partnerships went on to state that, "[a]s an initial, but certainly not final or complete response, we do not agree with the valuation of the Investment Partnership[s'] interest[s]" in the respective Developments. (*Id*.)

The Investment Partnerships did not provide further response to DASH's buyout notices. (*See* Dkt. No. 25 at 25.) On January 30, 2018, DASH filed this lawsuit against the Investment Partnerships, alleging that they breached the partnership agreements by refusing to sell their partnership interests in accordance with DASH's buyout notices. (*See* Dkt. No. 1 at 16–18.) DASH argues that is entitled to an order of specific performance, which would require the Investment Partnerships to sell their interests in the Developments in accordance with DASH's buyout notices. (*Id*. at 18.) In their cross-motion for summary judgment, the Investment Partnerships assert that their responses to DASH's buyout notices complied with Section 8.20 and therefore were not a breach of the partnership agreements. (Dkt. No. 22 at 3.) The Investment Partnerships further argue that there is a genuine dispute of material fact regarding the FMV of their partnership interests—a question that they believe must be decided by a jury. (*Id.*)

## II. DISCUSSION

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making such a determination, the Court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248–49.

### B. DASH's Breach of Contract Claim

Under Washington law, a breach of contract claim requires: "(1) a contract that imposed a duty, (2) breach of that duty, and (3) an economic loss as a result of that duty." *Myers v. State*, 218 P.3d 241, 243 (Wash. Ct. App. 2009). It is undisputed that the partnership agreements generally, and the buyout provisions specifically, imposed contractual duties on the Investment Partnerships. (Dkt. Nos. 22 at 16, 24 at 11.) In addition, DASH is not asking the Court to resolve the issue of damages at this time.[6] (Dkt. No. 24 at 21.) Therefore, the only issue the Court must decide on summary judgment is whether the Investment Partnerships' responses to DASH's buyout notices and their subsequent failure to sell their interests in accordance with DASH's buyout notices breached breached the partnership agreements.[7]

The undisputed evidence demonstrates that DASH exercised its buyout options for each of the Developments in accordance with Section 8.20 of the partnership agreements. DASH provided the Investment Partnerships with written buyout notices that proposed a timely closing date, and included all of the required appraisals and calculations. (*See* Dkt. Nos. 26-1 at 89–109; 26-2 at 2–22, 27–47.) DASH proposed, and the Investment Partnerships approved, Wilcox LaMotte to conduct appraisals in accordance with Section 8.20. (Dkt. No. 22-2 at 5.) Wilcox LaMotte's appraisals appear to have taken into consideration the factors outlined in Section 8.20(f). (*See* Dkt. Nos. 26-1 at 91–109; 26-2 at 5–22, 30–47.)

Notwithstanding DASH's valid exercise of its buyout options, the Investment

---

[6] DASH has sufficiently alleged—and the Investment Partnerships do not argue to the contrary—that it sustained damages as a result of the breach. (*See* Dkt. No. 25-1 at 77–78.)

[7] The Investment Partnerships state that "[t]he only issue before this Court is whether [the Investment Partnerships] breached Section 8.20 in how they responded to D.A.S.H.'s December 15 buyout notices." (Dkt. No. 31 at 1.)

Partnerships argue that they did not breach Section 8.20 because they "promptly objected to the value stated in the buyout notices . . . ." (Dkt. No. 31 at 3.) The Investment Partnerships assert that their response to DASH's buyout notices was sufficient to render the notices ineffective under Section 8.20(d). (*Id.*) ("Here, [the Investment Partnerships] informed D.A.S.H. the very next business day that the buyout notices contained material errors, specifically noting that the valuations of the partnership interests by Wilcox LaMotte were incorrect.").

The Court must first determine what the Investment Partnerships were required to do to invalidate DASH's buyout notices under Section 8.20(d), and then decide whether the Investment Partnerships met that standard. Pursuant to Section 8.20(d), there were two situations in which the Investment Partnerships could render DASH's buyout notices ineffective. First, a buyout notice was ineffective if it "fails to include the items required in . . . Section 8.20." (Dkt. No. 26 at 38.) Second, a buyout notice was ineffective if it "includes appraisals or calculations which, in the reasonable opinion of the Investment Partnership[s], contain material errors . . . ." (*Id.*) If the Investment Partnerships concluded that "a notice fails to constitute an effective Buyout Notice, [they] shall promptly so notify [DASH] and [DASH] may submit new or amended Buyout Notices at any time during the Option Period." (*Id.*)

Under the plain meaning of Section 8.20(d), the Investment Partnerships was required, at a minimum, to promptly notify DASH that its buyout notices were ineffective, and state why they were ineffective—in other words, the Investment Partnerships had to promptly notify DASH that its buyout notices either failed to contain an item required by Section 8.20 or that the calculations or appraisals contained what the Investment Partnerships reasonably believed to be a material error. (*See id.*)

The Investment Partnerships argue that Section 8.20(d) did not require them "to identify for D.A.S.H. with any level of specificity the material errors in a buyout notice." (Dkt. No. 22 at 16.) Instead, the Investment Partnerships assert that they were merely required to promptly inform DASH if their notice failed "to constitute an effective Buyout Notice." (*Id.*) The Court

disagrees with the Investment Partnership's narrow reading of the notice requirement.

Section 8.20(d) constitutes a notice and cure provision. If DASH breached its obligations to execute an effective buyout notice according to the terms of Section 8.20, the Investment Partnerships could invalidate the buyout option. In doing so, the Investment Partnerships were required to inform DASH that its buyout notice is ineffective, and DASH could "submit new or amended Buyout Notices at any time during the Option Period." (Dkt. No. 26 at 38.) Under Washington law, a notice and cure provision requires "clear and unambiguous notice, timely given, and in the form prescribed by the contract . . . ." *DC Farms, LLC v. Conagra Foods Lamb Weston, Inc.*, 317 P.3d 543, 551 (Wash. Ct. App. 2014) (citation and internal quotation marks omitted).

The Investment Partnerships' interpretation of Section 8.20(d) would undermine DASH's ability to cure an ineffective buyout notice. If the Investment Partnerships were merely required to inform DASH that its buyout notices were ineffective without explaining why, DASH would be left to guess at how to correct the alleged deficiency. In effect, the Investment Partnerships could foil DASH's ability to exercise its buyout option by vaguely objecting to the sufficiency of its buyout notices. The Court will not adopt the Investment Partnerships' preferred interpretation because doing so would frustrate the purpose of Section 8.20, and lead to absurd results. *See Forest Mktg. Enterprises, Inc. v. State, Dep't of Nat. Res.*, 104 P.3d 40, 43 (Wash. Ct. App. 2005) (courts are to avoid interpreting contracts "in ways that lead to absurd results.").

Having identified the duties imposed by Section 8.20(d), the Court must determine whether the Investment Partnerships' responses to DASH's buyout notices were sufficient to render them ineffective. Three days after receiving the buyout notices, the Investment Partnerships responded by objecting to DASH's suggestion that they provide a consultation within three days. (Dkt. No. 26-2 at 54, 57, 60.) The Investment Partnerships went on to write, "[a]s an initial, but certainly not final or complete response, we do not agree with the valuation of the Investment Partnership[s'] interest[s]." (*Id.*) The Investment Partnerships stated that they

would "respond within the first three weeks of January after we have had time to review the materials in depth." (*Id*.) The Investment Partnerships did not provide further response to DASH's buyout notices. (Dkt. No. 25 at 25.)

While certainly prompt, the Investment Partnerships response to the buyout notices neither notified DASH that a required item was missing from the notices nor expressed that the appraisals or calculations contained a material error.[8] The Investment Partnerships response that they did "not agree with the valuation of the Investment Partnership[s'] Interest[s]" did not identify a material error—it merely expressed a difference of opinion regarding the FMV of their interests. (Dkt. No. 26-2 at 54, 57, 60.) The Investment Partnerships' response did not mention anything about the Wilcox LaMotte appraisals, much less explain how they contained any errors, material or otherwise. In fact, the Investment Partnerships have admitted that they never identified any material errors with the Wilcox LaMotte appraisals to DASH. (*See* Dkt. No. 25 at 25.)

As the Court outlined above, Section 8.20(f) contains detailed requirements for how the parties' jointly-selected appraiser is to conduct an appraisal of the Investment Partnerships' interests in the Developments. *See supra* Section I. These detailed provisions would be rendered essentially meaningless if the Investment Partnerships could reject an appraisal by simply objecting to a valuation without explaining how it was a material error. If the Investment Partnerships' conclusory responses to DASH's buyout notices were sufficient to render them ineffective, DASH's ability to exercise the buyout option would be jeopardized.

In their briefing, the Investment Partnerships repeatedly state that they are entitled to the FMV of their Partnership interests, and that the buyout prices listed in DASH's notices are not reflective of the Partnerships' true value. (*See* Dkt. Nos. 22 at 17, 31 at 3.) What the Investment

---

[8] Having ruled that the Investment Partnerships failed to inform DASH that the buyout notices were ineffective—*i.e.*, that they failed to include an item required by Section 8.20 or contained material errors—the Court need not determine whether the Investment Partnerships acted reasonably in rejecting DASH's buyout notices.

Partnerships gloss over is that the buyout option specifies how the FMV of their interests is determined. (*See* Dkt. No. 26 at 37.) Neither the partnership agreements nor the buyout options entitled the Investment Partnerships to subjectively disagree with the appraised FMV of their interests and then hold out for what they believed to be a more accurate price. But that is exactly what the Investment Partnerships did when they failed to identify a material error in the buyout notices and failed to sell their interests in the Developments to DASH in accordance with those notices.

In summary, the undisputed evidence demonstrates that DASH validly exercised its buyout options in accordance with Section 8.20 and that the Investment Partnerships failed to invalidate the buyout options by providing DASH with adequate notice as required by Section 8.20(d). As a result, the Investment Partnerships breached the partnership agreements by failing to sell their entire interests to DASH pursuant to the terms contained in the buyout notices.

### III. CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment (Dkt. No. 24) is GRANTED and Defendants' cross-motion for summary judgment (Dkt. No. 22) is DENIED. In accordance with the Court's order:

The Court FINDS that Defendants breached the partnership agreements by failing to sell and transfer their partnership interests to Plaintiff pursuant to its buyout notices. As a result, Defendants will be required to sell and transfer their limited partner and special limited partner interests in each of the Partnerships in accordance with Plaintiff's buyout notices submitted on December 15, 2017. The Court will not set a date by which Defendants must sell and transfer their partnerships interests at this time because Plaintiff has reserved the issue of damages.

Within twenty-one (21) days of the issuance of this order, the parties shall file a joint status report proposing a new trial date and pre-trial deadlines.

//

//

DATED this 26th day of February 2019.

John C. Coughenour
UNITED STATES DISTRICT JUDGE